Filed 12/20/13  P. v. McGary CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>LAVELL A. MCGARY,<br><br>        Defendant and Appellant. | A132566<br><br>(Solano County<br>  Super. Ct. No. VCR198540) |

This is an appeal from final judgment after a jury convicted defendant Lavell A. McGary of second degree murder with enhancements for personally discharging a firearm and personally discharging a firearm causing great bodily harm.  Defendant challenges this judgment on grounds that include violation of his constitutional right to remain silent, evidentiary and instructional error, and violation of his constitutional right to due process based on the prosecution's withholding of impeachment evidence.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

On April 21, 2009, a criminal information was filed charging defendant with murder (Pen. Code, § 187, subd. (a)),[1] and alleging enhancements for personal use of a firearm, personally discharging a firearm and personally discharging a firearm causing great bodily harm (§§ 12022.5 subd. (a)(1), 12022.53, subds. (b), (c), (d)).  The information was based on the following events occurring in Vallejo in June 2008.

---

[1]        Unless otherwise stated, all statutory citations herein are to the Penal Code.

1

### A. The Prosecution's Case.

On June 26, 2008, the sister of co-defendant Daryl Gilmore (Daryl), Shaandreia Gilmore (Shy), had an argument with the victim, Ronelle "Nelly" Rucks (Rucks), with whom she was romantically involved.[2] During this argument, which was later reported to Daryl and defendant, Rucks threatened to kill Shy and her children.

Rucks was also romantically involved with Lashay Charleston (Shay). Rucks, Shay and their son lived in Building R at the Marina Apartments on Maine Street in Vallejo.[3] Shay knew Rucks also dated Shy.

On June 27, 2008 at about 11:00 a.m., Shay was outside her apartment with Rucks's sisters, Valerie and Tawana, when Shy drove up to the intersection of Marin and Pennsylvania in a burgundy-colored Nissan Pathfinder. With Shy in the Pathfinder were Maguerite (Mumu) and Marguerite's young nephew. The women began arguing despite Shy's initial statement that she wanted no trouble but simply to retrieve a pair of shoes she had given to Rucks. After five to ten minutes of arguing, Shy drove off without getting the shoes and Marguerite walked to her sister's nearby apartment.

A short time later, Daryl called defendant and told him Shy was having trouble with Rucks. Daryl wanted to "talk" to Rucks and asked defendant to come along for protection. Defendant agreed, and Daryl picked him up in Oakland in a green 1996 Mitsubishi before returning to Vallejo via the Carquinez Bridge. Defendant, who was always armed, carried a Browning Buckmark .22 caliber semiautomatic pistol loaded with 11 bullets.

At 1:03 p.m., Daryl was subject to a traffic stop for failing to pay the Carquinez Bridge toll. Although Daryl had no driver's license, he was let go with a citation. Daryl

---

[2]    On July 16, 2010, the trial court granted a prosecution motion to sever defendants' trials.

[3]    The gated Marina Apartment complex is comprised of several buildings spread across several square blocks bordered by Maine Street to the north and Marin Street to the east. Pennsylvania Street is parallel to, and two blocks south of, Maine Street, and starts at Marin Street before continuing east. Building R is located on the west side of Marin Street just south of Pennsylvania Street.

then continued to the Marina Apartments and parked next to Building R on Marin Street. The men entered the apartment complex and found Rucks, who was unarmed but accompanied by several men, including his brother Roy. Daryl and Rucks conversed briefly before Daryl and defendant decided to leave.

At about 1:30 p.m., Daryl and defendant exited through the apartment complex gate and walked toward their car. Rucks followed them, passing through the gate before stepping onto the sidewalk. At this point, defendant turned around and shot Rucks several times before running away. According to an eyewitness, as defendant ran, he followed behind two women who were also running down the sidewalk. Once the two women disappeared around the corner, defendant returned to Rucks, who was lying on the sidewalk. Standing over Rucks, defendant shot him several more times as Rucks tilted his head toward him and tried unsuccessfully to get up.[4]

Defendant then quickly jumped into the car with Daryl, who had made a U-turn and was double-parked on the west side of the street facing north against traffic. The car sped away, turning right onto Pennsylvania Street and right again onto Sonoma Boulevard. Rucks, meanwhile, bled to death within a few minutes despite the assistance offered by Shay, who had run outside upon hearing gunshots, and other bystanders, and despite the quick arrival of medical personnel.[5]

Daryl drove to the mobile home park in San Leandro where he lived in a two-story house at Unit One with his girlfriend, Jackie, the mobile home park manager. Daryl and defendant spent the night there before being located and arrested by Vallejo police officers the next day. Specifically, at about 5:00 p.m. on June 28, officers arrived at the mobile home park looking for Daryl, who ran past them before being arrested. The officers mistakenly had a warrant to search Unit Four rather than Unit One, so several

---

[4] Forensics expert Dr. Thomas Gill testified for the prosecution that, in total, Rucks was shot ten times and had no exit wounds. Nine of these shots were fired into the chest area and the tenth was to the head, ultimately lodging in Rucks's skull behind his left ear.

[5] When Shay ran outside toward Rucks, who has lying on the sidewalk, she saw defendant holding a gun and standing on the passenger side of a car parked on the street about 25 feet away.

officers "froze" Unit One while another officer left to obtain the correct warrant. At about midnight, the officers were able to lawfully enter Unit One, where they found and arrested defendant. They also found the murder weapon under a couch in an upstairs bedroom, as well as several hundred rounds of ammunition. Both Daryl's Mitsubishi and Shy's Pathfinder were parked outside.

Defendant was interviewed at the Vallejo Police Department from about 2:00 a.m. to 3:00 a.m. on June 29, 2008, by Detectives James Melville and Matthew Mustard. After being advised of and waiving his *Miranda* rights,[6] defendant, for about 45 minutes, denied being in Vallejo the previous day and denied any knowledge of Rucks's murder. In fact, defendant insisted he had been "high all day yesterday" on "powder" (methamphetamines), "didn't even go to sleep last night," and "don't even remember how [he] got to Daryl's house in the first place."[7] However, after further conversation, defendant eventually admitted being at the crime scene and shooting Rucks. Defendant explained that he feared for his life because Rucks had earlier threatened Shy and her children and because, when meeting with defendant and Daryl, Rucks and his colleagues had their hands in their shirts as if holding weapons. Further, as he and Daryl left the apartment complex, Rucks followed them out the gate, telling them he "could have kilt us inside of the building" if he wanted to. It was at that point, defendant insisted, that he shot Rucks until running out of bullets.

### B. The Defense Case.

Several women who had been romantically involved with Rucks were permitted to testify regarding his violent nature. For example, Shay testified that, on February 25, 2007, she and Rucks were arguing in a store parking lot in Vallejo when Rucks broke her car windshield and threw her keys. A police officer arrived a short time later, and Shay told him Rucks had choked her twice. Shay later signed a statement that Rucks had

---

[6]     *Miranda v. Arizona* (1966) 384 U.S. 436.

[7]     Defendant explained: "I don't even sleep, I stay high all day." Later, he added: "Drugs is a hell of a thing" "cause I don't even remember what happened."

4

threatened to shoot up her house and kill everyone inside, although at trial she testified that her statements were false.[8]

Makeba Fields testified that, in June 2008, Rucks hit her in the face after she became jealous of his involvement with another woman, causing her to be hospitalized. A few days later, Rucks grabbed her ponytail during an argument and slammed her head into a brick wall, causing another trip to the hospital. Nonetheless, Fields did not think Rucks had threatened to kill her because "[he] wasn't like that." Her statement was contradicted by Police Officer John Boyd, who testified that he observed a lump on Field's head the size of a silver dollar after he was dispatched to the hospital, and that she told him Rucks threatened: "I'm your boss and I'll kill you, bitch."

Myesha Williams testified that, on January 26, 2006, after meeting Rucks at his cousin's house, he requested a ride to the store. She complied with his request however, when she thereafter refused to drive him to Richmond, he told her: "You're either going to take me or get out." When Williams told him she was leaving, Rucks tried to take her keys, slapped her, and ultimately used one hand to choke her and the other to retrieve a gun from his pants. Rucks then put the gun to her head and told her to either get out or go with him, at which point Fields grabbed the keys, left the car and ran into the gas station to call the police. Rucks drove off after discovering Fields had mistakenly left the ignition key in the car.

Finally, Lakisha Gauner, who used to date Rucks and had a child with him, testified that, on April 20, 2005, Rucks punched her in the face with a closed fist during an argument at their apartment. When she went to the bathroom to call 911, Rucks threatened to hit her again. Then, in September of 2005, he punched her in the eye, dragged her to the couch and tried to smother her with a pillow. She went to a friend's

---

[8]     Police Officer Sean Kenney, to the contrary, testified that he prepared a police report on February 25, 2007 that indicated Shay had told him Rucks choked her twice, hurting her lip, warned her that he would to shoot up her house, and told her that "she did not know who she was messing with and that he's from Northridge." Officer Kenney did not observe any physical injuries on Shay, who then declined both medical attention and an emergency protective order.

house and called the police. On March 28, 2006, Rucks choked her with a heavy metal jewelry chain and, on July 2006, kicked her apartment door and threatened to beat her up if she didn't let him inside. Finally, in February 2008, Rucks became enraged when Gauner was late dropping off their son. He slapped her and pulled out some of her hair before putting the child in his van and driving away.

In addition to this testimony from Rucks's former girlfriends, defendant offered expert testimony from Dr. Randall Solomon, the medical director and senior supervising psychiatrist at California Medical Facility, regarding his problematic personal history and resulting cumulative mental trauma. Specifically, Dr. Solomon testified that, due to defendant's unstable and stressful upbringing, he lacked a sense of safety and was more prone to impulsive and over-reactive behavior when he felt threatened.[9] Defendant's behavior at the time of Rucks's death was an example of this tendency to overreact in hostile environments. Dr. Solomon acknowledged, however, that he did not perform psychological tests on defendant and found no evidence of psychosis. Moreover, while defendant had a "constellation of symptoms" and "reactions" similar to persons suffering from post traumatic stress disorder (PTSD), including increased aggression and hyper-alertness, Dr. Solomon concluded that defendant did not meet the criteria for PTSD.

### C. Jury Deliberations, the Verdict and Sentencing.

On September 8, 2010, a jury found defendant not guilty of first degree murder but guilty of second degree murder. The jury also found true the enhancements for personal discharge of a firearm and personal discharge of a firearm causing great bodily injury. Following a sentencing hearing on June 27, 2011, the trial court imprisoned defendant for an aggregate term of 40 years to life. This appeal followed.

---

[9] For example, defendant witnessed his mother give birth to his brother in the bathroom when he was three years old, experienced a friend being shot to death in seventh grade, was the victim of several crimes in grade school, and was beaten unconscious by several males (one younger and two adults) in tenth grade, an incident that triggered his decision to thereafter carry a gun for protection.

6

**DISCUSSION**

Defendant raises five issues for our review. First, defendant contends the trial court committed prejudicial error under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) by admitting into evidence his unlawfully-obtained statements to police detectives during a custodial interrogation just after the shooting. Second, defendant contends the trial court erroneously excluded from evidence a hearsay statement made by Shy to Detective Mustard during a police interrogation that he contends was admissible and material to his self-defense theory. Third, defendant contends the trial court erroneously instructed the jury regarding its consideration of evidence of his involvement in an assault in San Francisco in 2007. Fourth, defendant contends the trial court erroneously denied his motion for new trial based on the prosecution's withholding of critical impeachment evidence regarding its expert forensics witness, Dr. Thomas Gill. And, finally, in addition to arguing cumulative error based on the aforementioned issues, defendant contends the trial court improperly imposed against him a restitution fine after misinterpreting the governing statute. We address each alleged error in turn.

I.      **Was defendant's constitutional right to remain silent violated?**

The first issue relates to defendant's purported invocation of his right to remain silent during his interview with investigating officers soon after his arrest on June 28, 2008. "[U]nder the due process clause of the Fourteenth Amendment to the United States Constitution . . . an involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion is inadmissible in a criminal proceeding." (*People v. Neal* (2003) 31 Cal.4th 63, 67.) As such, a statement obtained by an officer from a suspect during a custodial interrogation "may be admitted in evidence only if the officer advises the suspect of both his or her right to remain silent and the right to have counsel present at questioning, and the suspect waives those rights and agrees to speak to the officer." (*Ibid.*) If at any time the suspect indicates that he does not wish to speak, or to continue to speak, to the officer, the interrogation must end and may not resume unless and until counsel is present or the suspect voluntarily initiates further contact. (*Ibid.*)

7

However, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." (*Davis v. United States* (1994) 512 U.S. 452, 459.) "Rather, the suspect must unambiguously request counsel." (*Ibid.* See also *People v. Bacon* (2010) 50 Cal.4th 1082, 1107 ["defendant's invocation of the right to counsel must be clear and unambiguous"]; *People v. Johnson* (1993) 6 Cal.4th 1, 27, overruled on another ground by *People v. Rogers* (2006) 39 Cal.4th 826, 879.)[10]

The prosecution bears the burden of proving the defendant's waiver of rights and subsequent incriminating statements were voluntarily, knowingly and intelligently made. (*People v. Whitson* (1998) 17 Cal.4th 229, 248.) A showing of voluntariness must be based on "all the surrounding circumstances," including the defendant's intelligence, sophistication and prior experiences, his mental and physical state at the time of interrogation, and the methods employed by his interrogators. (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226; *People v. Guerra* (2006) 37 Cal.4th 1067, 1093; *People v. Lewis* (2001) 26 Cal.4th 334, 383.)

" 'The scope of our review of constitutional claims of this nature is well established. We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained. [Citation.]' " (*People v. Johnson, supra,* 6 Cal.4th at p. 25.)

At the outset of our inquiry, we must address the People's contention that defendant forfeited his *Miranda* claims by not raising them in the trial court. As the People point out, the California Supreme Court has not hesitated to reject *Miranda* claims

---

[10] The U.S. Supreme Court has stated that, when a suspect's statement is ambiguous or equivocal, "it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." (*Davis v. United States, supra*, 512 U.S. at p. 461.)

8

on appeal based upon the well-established principle of forfeiture.  Specifically, "Evidence Code section 353, subdivision (a) allows a judgment to be reversed because of erroneous admission of evidence only if an objection to the evidence or a motion to strike it was 'timely made and so stated as to make clear the specific ground of the objection.' Pursuant to this statute, ' "we have consistently held that the 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable.' " [Citation.]' [Citation.]  'To satisfy Evidence Code section 353, subdivision (a), the objection or motion to strike must be both timely *and* specific as to its ground. An objection to evidence must generally be preserved by specific objection at the time the evidence is introduced; the opponent cannot make a 'placeholder' objection stating general or incorrect grounds (e.g., 'relevance') and revise the objection later in a motion to strike stating specific or different grounds.' [Citation.]"  (See *People v. Rundle* (2008) 43 Cal.4th 76, 116, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Here, the record reflects that, while the trial court did conduct a hearing to determine the admissibility of defendant's statements during his custodial interrogation, this hearing was held on the People's written motion rather than on defendant's motion. Defense counsel, while filing several motions in limine regarding the admissibility of specific items of evidence, filed nothing in reply to the People's motion, and filed nothing otherwise related to the admissibility of his extra-judicial statements to detectives.  In addition, at the hearing on the People's motion, defense counsel raised no argument that the detectives violated defendant's *Miranda* rights.  Quite to the contrary, defense counsel advised the court, "I'm not objecting to the introduction of his statement." Further, defense counsel stated, "Yes, Your Honor," when the court then confirmed, "neither defendant is expressing any objection to the admission of the statements that were attributed to Mr. McGary as stated in the [prosecution's] Miranda motion filed July 6, 2010, is that a correct statement?"  Based on defense counsel's confirmation, the trial court ruled that an evidentiary hearing with respect to defendant's statements would not be necessary.

9

The trial court thereafter sought additional confirmation from counsel when considering the People's request to grant with prejudice its motion to admit defendant's extra-judicial statements:

"[COURT:]  There's no indication that I can see of any coercion on Mr. McGary's part. There's no indication that he unequivocally stood on his right to remain silent or unequivocally at any point in the interview withdrew, if you will, his consent to carry on with the interviews. [¶]  And, as a result, it appears the court should rule that all of the statements that are represented in the *Miranda* motion itself will be admissible in Mr. McGary's trial; and that that order . . . if another Judge is hearing the case, the ruling needs to be made such that it's binding now on the trial.  Is there any objection to the Court specifying that that's the duration of the ruling, [defense counsel], regardless of whether the case is heard by this Judge or another Judge?

"[DEFENSE COUNSEL]:  Well, Your Honor, I can tell the Court this morning that I do not object on *Miranda* grounds to the introduction of my client's statement.  I received [the prosecutor's] motion to admit the statement and citations to authority regarding *Miranda.*  And I have not filed any written objection, and I am not objecting this morning on *Miranda* grounds.  So as to that issue, I have no objection. [¶¶]

"[COURT]:  All Right.  So the question is:  *Do we have this order crystallized, and ruling, such that the People can depend on it without further concerns at the time of trial, regardless of who tries the case*?  And I'm expecting that to be me, but things could happen.  Is that agreeable, [defense counsel]?

"[DEFENSE COUNSEL:] Yes, it is, Your Honor."  (Italics added.)

Thus, based at least in part on defense counsel's acquiescence, the trial court ruled defendant's statements admissible "with prejudice to all parties at trial."

Given this record, we agree with the prosecution that defendant has forfeited the right to challenge on *Miranda* grounds the admission of his extra-judicial statements to investigators.  While our reasoning should already be well-understood by counsel, we nonetheless take time to reiterate it:  "The objection requirement is necessary in criminal cases because a 'contrary rule would deprive the People of the opportunity to cure the

defect at trial and would 'permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal.' [Citation.] 'The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.' [Citation.] [¶] . . . [Moreover,] 'the objection must be made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility.' [Citation.] What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling. If the court overrules the objection, the objecting party may argue on appeal that the evidence should have been excluded for the reason asserted at trial, but it may not argue on appeal that the court should have excluded the evidence for a reason different from the one stated at trial. *A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct.*" (*People v. Partida* (2005) 37 Cal.4th 428, 434-435 [italics added].)

Here, despite his counsel's clear and repeated insistence in open court that no *Miranda* challenge was being made, defendant contends the forfeiture rule should not apply because, based on the People's motion, the trial court had reason to, and did, consider whether any *Miranda* violation had occurred. In doing so, defendant relies on a California Supreme Court case, *People v. Williams* (2010) 49 Cal.4th 405, 424, wherein the court declined to base its decision on the forfeiture rule, despite the defense counsel's failure to raise a *Miranda* objection below, because the People's motion to admit the defendant's extra-judicial statements "brought certain elements of the *Miranda* claim before the court, including the possibility that defendant had invoked his right to counsel

11

at the outset of the first interrogation, and that his waiver of rights on that occasion was involuntary because of the officers' mention of the death penalty." (*Id*. at pp. 424-425.)

We do not find defendant's authority helpful in our case. First, contrary to defendant's suggestion, the high court in *People v. Williams* did not actually rely on the forfeiture principle when ruling; rather, it "[a]ssum[ed], without deciding, that defendant's claims were preserved" before concluding his claims lacked merit. (*Id*. at pp. 424-425.) Moreover, contrary to our defendant, the defendant in *People v. Williams*, did in fact testify at the lower court hearing that "he 'continually' invoked his right to counsel during several days of interrogation, but that his invocation was disregarded." (*Id*. at p. 425.) As the record set forth above demonstrates, neither defendant nor his counsel took any position contrary to the People's motion in this case, much less offered evidence or testimony suggesting a *Miranda* violation. As such, we stand by our conclusion that defendant has forfeited this issue.[11]

## II.    Did the trial court err by excluding evidence of Shy's statement to police regarding the victim's sisters' alleged threatening behavior?

Defendant contends the trial court erred by excluding from evidence Shy's hearsay statement to Detective Mustard that Rucks's sisters shattered her apartment windows just before his murder. This purported error was, according to defendant, prejudicial because "if the jury found [he] believed, based on his knowledge of Rucks's and his sisters'

---

[11]    Indeed, on this record, it appears defense counsel may have actually invited the purported error:  " 'The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal. . . . [I]t also must be clear that counsel acted for tactical reasons and not out of ignorance or mistake.' In cases involving an action affirmatively taken by defense counsel, we have found a clearly implied tactical purpose to be sufficient to invoke the invited error rule. (See [citations].)" (*People v. Coffman & Marlow* (2004) 34 Cal.4th 1, 49, quoting *People v. Wickersham* (1982) 32 Cal.3d 307, 330, disapproved on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 201.)"   Here, defendant's counsel did more than acquiesce to the trial court's *Miranda* ruling, he "affirmatively joined" in it, and thus should not now be permitted to claim the court erred. (*People v. Coffman & Marlow, supra,* 34 Cal.4th at p. 49.)

behavior that they were violent towards Shy, Daryl and [defendant], that would have been a basis for acquittal of second degree murder . . . ."

"A trial court has broad discretion in determining relevancy, but it cannot admit evidence that is irrelevant or inadmissible under constitutional or state law. [Citation.] 'The proponent of proffered testimony has the burden of establishing its relevance, and if the testimony is comprised of hearsay, the foundational requirements for its admissibility under an exception to the hearsay rule. [Citations.] Evidence is properly excluded when the proponent fails to make an adequate offer of proof regarding the relevance or admissibility of the evidence. [Citations.]' (*Ibid.*; see Evid. Code, § 1200, subd. (b).)" (*People v. Blacksher* (2011) 52 Cal.4th 769, 819-820.) Such rulings will be overturned on appeal only upon a showing of abuse of that discretion. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070; *People v. Cudjo* (1993) 6 Cal.4th 585, 609.)

The record reflects that, at trial, Detective Mustard testified regarding his interview with Shy shortly after the murder. Relevant here, Detective Mustard testified over defense objections that Shy did not mention being scared of Rucks or being threatened by him. On cross-examination, defense counsel asked Detective Mustard whether Shy told him "that the night before the shooting, Ronelle Rucks's sisters came over to her apartment and smashed out all her windows."[12] The prosecutor objected on hearsay and relevance grounds, and the trial court sustained the objection, barring any questions related to Rucks's sisters.

On appeal, defendant acknowledges that Shy's statement regarding the actions of Rucks's sisters is hearsay given that Shy did not appear for trial. However, defendant insists her statement is nonetheless admissible pursuant to Evidence Code section 356 and relevant to prove his state of mind for purposes of his self-defense theory. We disagree.

Evidence Code section 356 provides in relevant part: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the

[12] According to defendant, Shy's hearsay statement regarding the actions of Rucks's sisters was disclosed by the prosecution during discovery.

13

same subject may be inquired into by an adverse party . . . ." (Evid. Code, § 356.) "However, this provision ' "is necessarily subject to the qualification that the court may exclude those portions of the conversation not relevant to the items thereof which have been introduced." ' (Citation; Legislative Committee Comment to Evid. Code, § 356.) 'The rule is not applied mechanically to permit the whole of a transaction to come in without regard to its competency or relevancy . . . .' (Witkin, Cal. Evidence . . . § 320, p. 283.)" (*People v. Perry* (1972) 7 Cal.3d 756, 787 [fn. omitted].) In this case, defendant theorizes the evidence is relevant to prove his state of mind, and specifically the legitimacy of his belief in the need to defend himself against Rucks, a theory the trial court rejected when sustaining the prosecutor's objections. We conclude the trial court's ruling was within the broad scope of its discretion, notwithstanding Evidence Code section 356.

In reaching this conclusion, we do not disagree with defendant's point that, in some cases, "one's fear of another may come from a threat either by that person, or a close associate." However, the threat, whether made by the victim or, as here, the victim's family member, still must be directed toward the defendant such that the defendant's state of mind, rather than someone else's, is impacted:

 "A person claiming self-defense is required to 'prove his own frame of mind,' and in so doing is 'entitled to corroborate his testimony that he was in fear for his life by proving the reasonableness of such fear.' [Citation.] *The defendant's perceptions are at issue*, and threats from a family and its friends may color a person's perceptions of that group no less than threats from an individual may color a person's perceptions of that individual. A defendant who testifies that he acted from fear of a clan united against him is entitled to corroborate that testimony with evidence 'tend[ing] in reason to prove' that the fear was reasonable. (Evid. Code, § 210 [defining relevant evidence].) Threats from the group on the defendant's life would certainly tend in reason to make the defendant fearful. This is especially true where the group has a reputation for violence, and that reputation is known to the defendant. Such threats are relevant to the defendant's state of mind — a matter 'of consequence to the determination of the action' (*ibid*.) — and the trier

of fact is entitled to consider those threats along with other relevant circumstances in deciding whether the defendant's actions were justified." (*People v. Minifie, supra,* 13 Cal.4th, at p. 1066 [italics added]. See also *People v. McKinnon* (2011) 52 Cal.4th 610, 666.)

Here, there is no evidence defendant was told about, or otherwise knew about, the alleged threatening acts by Rucks's sisters toward Shy. And, as defendant's own authority explains, " 'a defendant's evidence of self-defense is subject to all the normal evidentiary rules, including Evidence Code sections 350 [only relevant evidence is admissible] and 352.' [Citation.] Evidence of third party threats is relevant only if other evidence shows [the defendant's] fear of imminent harm. (*Ibid.*) Even then its probative value may be slight. . . . The more vague the threats, and the weaker the logical link between them and the defendant's actions, the more the court may be justified in excluding them." (*People v. Minifie*, *supra*, 13 Cal.4th at p. 1070.)

Based on these principles, the trial court could properly find this evidence irrelevant to defendant's state of mind and, thus, not admissible. Simply put, for purposes of proving self defense, "[r]easonableness is judged by how the situation appeared to the *defendant*," not a third party such as Shy. (*People v. Minifie*, *supra*, 13 Cal.4th at p. 1068.) The trial court's ruling to exclude this evidence thus stands.

## III.    Was the jury erroneously instructed as to its consideration of evidence of defendant's alleged prior violent conduct?

Defendant contends the trial court erred when it granted the prosecutor's request to instruct the jury with respect to its consideration of evidence, in the form of testimony provided by witness Luis Canche, that defendant and some other men assaulted him and a friend in San Francisco in 2007.[13] This testimony was admitted by the trial court pursuant to Evidence Code section 1103, subdivision (b), following defense counsel's proffer of evidence regarding Rucks's pattern of engaging in violent acts against women

---

[13]    Defendant stipulated that he was the person involved in this incident with Canche.

15

with whom he was or had been romantically involved.[14]  The requested instruction, based on Evidence Code section 1103, subdivision (b), was as follows: "You have heard character testimony that the defendant is a violent person or has a violent character trait. [¶] You may take that testimony into consideration along with all the other evidence in deciding whether the People have proved that the defendant is guilty beyond a reasonable doubt."  This instruction was a modified version of CALCRIM No. 350 in that it included only the first two paragraphs of the standard instruction.[15]

Defendant does not contend Canche's testimony regarding defendant's assault against him was improperly admitted.  Rather, defendant contends the instruction on the jury's consideration of this testimony was prejudicially argumentative because it "focused the jury on the Canche testimony that [defendant] was 'a violent person or has a violent character trait' and told the jurors they may consider that evidence in deciding [his] guilt."  We disagree.

" 'A trial court must instruct on the *law* applicable to the facts of the case. [Citation.] In addition, a defendant has a right to an instruction that pinpoints the *theory* of the defense. [Citation.] The court must, however, refuse an argumentative instruction, that is, an instruction 'of such a character as to invite the jury to draw inferences

---

[14]    Evidence Code section 1103, subdivision (b), provides: "In a criminal action, evidence of the defendant's character for violence or trait of character for violence (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) is not made inadmissible by Section 1101 if the evidence is offered by the prosecution to prove conduct of the defendant in conformity with the character or trait of character and is offered after evidence that the victim had a character for violence or a trait of character tending to show violence has been adduced by the defendant under paragraph (1) of subdivision (a)."

[15]    The omitted paragraphs of CALCRIM No. 350 state: "Evidence of the defendant's character for ____ can by itself create a reasonable doubt.  However, evidence of the defendant's good character may be countered by evidence of (his/her) bad character for the same trait. You must decide the meaning and importance of the character evidence. [¶] If the defendant's character for certain traits has not been discussed among those who know (him/her), you may assume that (his/her) character for those traits is good."

favorable to one of the parties from specified items of evidence.' [Citation.]" (*People v. Panah* (2005) 35 Cal.4th 395, 486.)

Here, the instruction given by the trial court is a correct statement of the law. "California has adopted the view originally espoused by Wigmore, that evidence of the defendant's violent character is admissible if the defendant offers evidence of the victim's violent character in aid of a claim of self-defense: 'If the [victim's] character for violence has thus been introduced by the defendant, the same principle would then justify the prosecution (or plaintiff) in introducing the defendant's character for violence, by way of exception to the rule [that evidence of the defendant's character is not generally admissible].' (IA Wigmore, Evidence (Tillers ed. 1983) § 63, pp. 1378-1379.)" (*People v. Blanco* (1992) 10 Cal.App.4th 1167, 1173-1174.) That is exactly what happened here, and thus justified the trial court's instruction – to wit, the prosecution offered Canche's testimony in response to defense counsel's offer of testimony from multiple witnesses regarding Rucks's violent nature toward women. Indeed, "[defendant] has a choice as to presenting evidence of the victim's character, which is similar to many tactical choices at trial ─ such as deciding whether to testify, or whether to present direct evidence of his own good character. The defense choice of strategy often makes admissible in rebuttal certain evidence which would not be admissible in the prosecution's case-in-chief." (*People v. Blanco, supra,* 10 Cal.App.4th at p. 1176.) Having made his choice to present evidence of Rucks's extensive history of violence, defendant cannot now complain when the prosecution countered with evidence of an incident of defendant's own violent past.

Moreover, we further note the instruction did not explicitly or implicitly invite the jury to draw from Canche's testimony an inference favorable to the prosecution. Rather, CALCRIM No. 350, by its terms, permitted, but did not require, jurors to consider Canche's testimony that defendant is a violent person or has a violent character trait in a specific, appropriate way: "You *may take that testimony into consideration, along with all the other evidence*, in deciding whether the People have proved that the defendant is guilty beyond a reasonable doubt." (Italics added.) The instruction's use of the permissive term, "may," was neither ambiguous, unusual, nor purporting to create any

17

presumption for or against the veracity of Canche's testimony. To the extent defendant claims harm from Canche's testimony, such harm does not stem from the instruction, but rather from the underlying nature of the evidence that defendant assaulted Canche, a total stranger, at night on a random street. Yet there is no doubt this evidence was admissible pursuant to Evidence Code, section 1103, subdivision (b). Indeed, defendant does not contend otherwise. As such, we decline to presume the jury, composed of men and women of reasonable intelligence, was incapable of understanding or following the instruction regarding proper consideration of this otherwise admissible evidence. (Compare *People v. Hudson* (2009) 175 Cal.App.4th 1025, 1028-1029 [because CALCRIM No. 318 states the jury "may" reject testimony if inconsistent with a pretrial statement, there is no basis for defendant's claim the instruction lessens the prosecution's standard of proof by compelling the jury to accept a pretrial statement as true]. See also *People v. Richardson* (2008) 43 Cal.4th 959, 1027-1028.)

Defendant's argument also disregards the trial court's other instructions, including CALCRIM No. 225, which, among other things, advised the jury that, "before you may rely on circumstantial evidence to conclude that the defendant had the required intent and/or mental state, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required intent and/or mental state." And further diminishing any risk of jury confusion, the trial court gave CALCRIM No. 220, which, among other things, advised the jury of defendant's presumption of innocence, of the prosecution's duty to prove every element of each charged offense beyond a reasonable doubt, and of each juror's duty to impartially consider all evidence before reaching a verdict.

Thus, considered in the proper context of the jury charge as a whole, we conclude there is no reasonable likelihood the jury misapplied the court's instruction based on CALCRIM No. 350. (*People v. Frye* (1998) 18 Cal.4th 894, 957.) Contrary to defendant's suggestion, this instruction was quite clear in its command that the jury could, but was not required to, consider evidence in the form of Canche's testimony that

defendant was "a violent person or has a violent character trait" to prove conduct of defendant in conformity with that character trait.

**IV.    Did the trial court erroneously deny defendant's motion for new trial?**

Defendant also challenges on appeal the trial court's denial of his motion for new trial based on newly discovered evidence that the prosecution failed to disclose before his trial. (§ 1181, subd. (8).)[16] Defendant contends the trial court's ruling violated his constitutional right to due process of law under the Fourteenth Amendment of the United States Constitution, in that the withheld evidence was both favorable and material to the issue of his guilt. (*Brady v. Maryland* (1963) 373 U.S. 83, 87.)

The following well-established legal principles guide our review. "In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." ' [Citations.]" (*People v. Delgado* (1993) 5 Cal.4th 312, 328; see also *People v. Soojian* (2010) 190 Cal.App.4th 491, 512.) " ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' [Citations.] ' "[I]n determining whether there has been a proper exercise of discretion on such motion, each case must be judged from its own factual background.' " [Citation]." (*People v. Delgado, supra,* 5 Cal.4th at p. 328.)

Here, defendant's motion for new trial was based on evidence, discovered after trial by defense counsel through local and national media sources, that the prosecution's

---

[16]    "When a verdict has been rendered or a finding made against the defendant, the court may, upon his application, grant a new trial, in the following cases only: [¶] . . . [¶] (8) When new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial. . . ." (§ 1181, subd. (8).)

expert forensics witness, Dr. Thomas Gill, had:  (1) a history of alcohol abuse and arrest; (2) provided false and misleading testimony several times in the past; (3) been dismissed from previous forensic pathology positions for poor work quality; and (4) was involved in a Sonoma County case, *People v. Pelfini* (No. SCR30250), that was ultimately dismissed due, according to defendant, to Dr. Gill's incompetence and dishonesty.  The prosecutor conceded the evidence regarding Dr. Gill was exculpatory and unintentionally withheld, but denied it was material to defendant's case.  According to the defendant, however, "the prosecutor's knowing failure to disclose [this] devastating impeachment evidence about [Dr.] Gill undermines confidence in the District Attorney's Office, the court, and the verdict," and thus requires a new trial.

In denying defendant's new trial motion, the trial court found that the newly-offered evidence was simply not material in that it failed to raise a significant doubt as to his guilt.  According to the trial court, there was no reasonable probability this new evidence, wholly unrelated to the charged offenses, would lead to a new outcome on retrial.  We agree with the trial court.

" '[T]he prosecution has no *general duty* to seek out, obtain, and disclose all evidence that might be beneficial to the defense' [citation], since 'the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense.' [Citation.]  Rather, a violation occurs " 'only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different.' [Citations.] The requisite 'reasonable probability' is a probability sufficient to 'undermine[] confidence in the outcome' on the part of the reviewing court. (*In re Sassounian* (1995) 9 Cal.4th 535, 544.)"  [¶] " '[Moreover,] [i]n general, impeachment evidence has been found to be material where the witness at issue "supplied the only evidence linking the defendant(s) to the crime," *United States v. Petrillo*, 821 F.2d 85, 90 (2d Cir. 1987); *see also Giglio v. United States*, 405 U.S. [150,] 154-155 [31 L.Ed.2d 104, 92 S.Ct. [763,] 766 [(1972)] (*Brady* violation found where government failed to disclose promise not to prosecute cooperating witness on whom government's case against defendant "almost entirely" depended), or where the likely impact on the

witness's credibility would have undermined a critical element of the prosecution's case, *see United States v. Badalamente*, 507 F.2d 12, 17-18 (2d Cir. 1974) (same re nondisclosure of "hysterical" letters that would have had "powerful adverse effect" on witness's credibility, where that credibility was "crucial to the determination of [the defendant's] guilt or innocence"); *cert. denied*, 421 U.S. 911 [43 L.Ed.2d 776, 95 S.Ct. 1565 (1975)]. In contrast, a new trial is generally not required when the testimony of the witness is "corroborated by other testimony," *United States v. Petrillo*, 821 F.2d at 89 . . . ; [citation]; *see also Giglio v. United States*, 405 U.S. at 154 [92 S.Ct. at 766] (new trial not required where newly discovered evidence is merely "possibly useful to the defense but not likely to have changed the verdict").' (*U.S. v. Payne* (2d Cir. 1995) 63 F.3d 1200, 1210.)" (*People v. Salazar* (2005) 35 Cal.4th 1031, 1049-1050. See also *Kyles v. Whitley* (1995) 514 U.S. 419, 439 [the due process clause "does not tax the prosecutor with error for any failure to disclose, absent a further showing of materiality"]. Cf. *People v. Randle* (1982) 130 Cal.App.3d 286, 293 [prejudicial error to deny motion for new trial where the newly proffered evidence "does more than merely impeach [the only percipient witness other than the defendant] — it tends to destroy her testimony by raising grave doubts about her veracity and credibility"]; *People v. Huskins* (1966) 245 Cal.App.2d 859, 862-863 [while "[o]rdinarily, evidence which merely impeaches a witness is not significant enough to make a different result probable," it was error to deny a motion for new trial in a child sexual abuse case where the new evidence eviscerated the credibility of "the sole adult witness connecting the defendant with the charged acts"].)

Here, the record makes clear Dr. Gill's testimony was far from the only evidence linking defendant to the murder. In fact, Dr. Gill's opinions regarding the cause and medical details of Rucks's non-accidental death were not challenged by the defense at trial or on appeal and are, in any event, corroborated by testimony from eyewitnesses at the scene who described hearing two to three gunshots, a pause, following by several more gunshots (for a total of eight to 10 bullets). For example, several witnesses, including Matias Santini and Stephen Allen, who were working in an office building

across the street from the Marina Apartments, testified that they first heard two or three gunshots and then, looking in the direction of those shots, saw the shooter, who was identified by two people as defendant (Shay and Lazzarotto), fire several more shots into another man lying just steps away on the sidewalk. Consistent with their testimony, Shay, who was in another apartment on the second floor of the same complex, heard several gunshots, ran outside, and saw Rucks lying on the side while defendant, holding a gun, was standing on the passenger side of a car parked on the street about 25 feet away.[17] In addition, Shay described watching as Rucks took his last few breaths just moments later. And police clerk Angela Cunha, who was present for the autopsy, observed about eight to 10 bullets being removed from Rucks's body. Finally, defendant's own lawfully-obtained admissions to police detectives of having fired at least five shots into Rucks were consistent with the testimony of these witnesses, and essentially put to rest any doubt as to his guilt. To the extent defendant's role in Rucks's death was a matter of dispute, it was his intent, not his manner of inflicting death, that was put to the jury.

Under these circumstances, even assuming Dr. Gill's credibility as a witness would have been undermined by admission of the identified newly-discovered evidence, we nonetheless have no trouble concluding the jury's assessment of defendant's guilt would not have been materially affected. (See *People v. Delgado, supra*, 5 Cal.4th at p. 328.) Thus, we conclude the trial court acted well within the scope of its discretion in denying defendant's motion for new trial.

Finally, in addition to arguing that specific errors at trial require reversal, defendant argues their cumulative impact requires reversal because the errors, considered together, cannot be proved harmless beyond a reasonable doubt. We disagree. As we have explained above, few errors, if any, were committed at trial, and no error affected

---

[17] Defendant insists Shay was an interested witness given that Rucks was the father of her child, and argues there was "no reliable evidence that [he], and not Daryl, was the shooter." However, he points to no actual evidence indicating Daryl was the shooter, nor any evidence that Shay was biased against him or had any reason to falsely accuse *him* of murdering Rucks.

the verdict. As such, no ground for reversal exists. (*People v. Marshall* (1990) 50 Cal.3d 907, 945 [" ' " 'defendant is entitled to a fair trial but not a perfect one' " ' "].)

## VI. Was the section 1202.4 restitution fine properly imposed against defendant?

Finally, defendant raises one issue with respect to the various fines and assessments imposed against him by the trial court following his sentencing hearing. Specifically, he contends it was error to impose an $8,000 restitution fine because the applicable statutory provision, section 1202.4, subdivision (b), sets forth a permissive formula, which the trial court misinterpreted as a "mandatory minimum."[18] In requesting remand based on this contention, defendant relies on the well-established principles that, "[w]hen a trial court is mistaken about the scope of its discretion, even if the mistake is reasonable, an action taken in accord with that mistaken view is error." (*Perko's Enterprises, Inc. v. RRNS Enterprises* (1992) 4 Cal.App.4th 238, 245.) Where a trial court mistakenly assumes that it lacks discretion to do something and thus fails to exercise its discretion, the matter must be remanded to permit the trial court to correct its error. (*People v. Meloney* (2003) 30 Cal.4th 1145, 1165. [remanding to permit the trial court to exercise its discretion where the "court never clearly declined to exercise that discretion," but rather appears to have been "unaware of its authority to do so"].) We, however, find this principle inapplicable in this case.

Specifically, defendant contends the trial court mistakenly failed to exercise its discretion when imposing a restitution fine against him pursuant to section 1202.4, subdivision (b), which provides in relevant part: "(b) In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record. [¶] "(1) The restitution fine *shall be set at the discretion of the court* and commensurate with the seriousness of the offense. If the person is convicted of a felony, the fine shall not be less than two hundred forty dollars ($240) starting on January 1, 2012, two hundred eighty dollars ($280) starting on January 1, 2013, and three

_____

[18] The trial court also imposed a parole revocation fine, likewise in the amount of $8,000, pursuant to section 1202.45.

23

hundred dollars ($300) starting on January 1, 2014, and not more than ten thousand dollars ($10,000). If the person is convicted of a misdemeanor, the fine shall not be less than one hundred twenty dollars ($120) starting on January 1, 2012, one hundred forty dollars ($140) starting on January 1, 2013, and one hundred fifty dollars ($150) starting on January 1, 2014, and not more than one thousand dollars ($1,000). (Italics added.) "(2) In setting a felony restitution fine, the court *may* determine the amount of the fine as the product of the minimum fine pursuant to paragraph (1) multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted."[19] (§ 1202.4, subd. (a), (b).)

When imposing this particular fine against defendant, the trial court explained on the record that: "Under 1202.4, subdivision (d),[20] of the Penal Code, specifically subsection (b)(1) and (b)(2), the court will impose a fine in the amount of 200 dollars per year [of imprisonment]. Total 8,000 dollars . . . [¶] as a mandatory restitution fine under 1202.4(b)." According to defendant's reading of this record, the trial court was unaware that it could have set the lower statutory amount of $200, instead of multiplying that amount by the number of years of his imprisonment (40 years) pursuant to section 1202.4, subdivision (b)(2), to reach the actual fine of $8,000. However, interpreting the factual record in a light most favorable to upholding the judgment, as the law requires, we conclude the trial court acted appropriately and in accordance with its authority pursuant to section 1202.4, subdivision (b)(2), by increasing the statutory minimum of $200 based on the years of defendant's imprisonment. Moreover, we conclude, contrary to defendant's theory, that the trial court simply labeled this fine "a mandatory restitution fine" in recognition of the fact that, pursuant to section 1202.4, subdivision (b)(1), it lacked authority to decline imposition of the fine, rather than under the mistaken

---

[19] At the time of defendant's sentencing, section 1202.4 provided that the fine "shall not be less than two hundred dollars ($200), and not more than ten thousand dollars ($10,000), if the person is convicted of a felony." (Stats 2010, ch. 351, § 9, § 1202.4, subd. (b).) The statute did not otherwise differ in relevant part.

[20] It appears that the court's initial reference to "subdivision (d)" was intended to be to "subdivision (b)."

impression that it lacked authority to impose the $200 statutory minimum.[21]

Accordingly, the $8,000 fine stands as is.

**DISPOSITION**

The judgment is affirmed.

_____
Jenkins, J.

We concur:

_____
McGuiness, P. J.

_____
Siggins, J.

---

[21] Indeed, prior to the court's ruling, defense counsel specifically advised the judge that "the mandatory minimum is no less than 200," to which the court asked: "Per year, or 200 altogether?" Defense counsel then clarified: "Yeah, I think 1202.4(b)(1) says no less than two, no more than ten. And I think (b)(2) then says the Court can use that calculation [i.e., multiplying the minimum amount by the years of imprisonment] that the Court is referring to." This record is wholly consistent with the trial court's proper exercise of discretion under the statute.